, and Mr. Worker, we'll hear from you, too. Good morning, Your Honor. Stan Worker on behalf of Westchester Surplus Lines. As the Court knows, this is an insurance coverage case. The coverage issue arises from a construction project that was being performed by a joint venture with our insurer, Clancy, being a minority shareholder in that joint venture. The insurance company, Westchester Surplus had proceeded for about five months before Clancy came to Westchester to procure the insurance policy issued by Westchester. During the course of construction, it was determined that the foundation was put in incorrectly. One of the joint venture's subcontractors had made a miscalculation on the soil conditions with regard to this foundation, and it was starting to cause some sinking with regard to the foundation, which was creating problems in the building. The joint venture met with the owner and proposed a remedy under the contract that they had with them to fix this problem in the structure. During the course of that solution, the owner accepted a change order from the joint venture to correct the problem by modifying the contract that they had entered into. The owner was insisting on performance, a guarantee that the work performed on the job site would meet the contract requirements. Since the foundation needed to be remedied in a different way than was called by the contract, a change order was necessary in order to make those repairs. The issue in this case is whether or not that error caused by the joint venture and the joint venture's subs would translate into coverage under a professional liability policy issued to only one of the joint venture members under the Westchester policy. What do you think that coverage provided Clancy? We believe that the coverage was intended not to insure the joint venture. I think the record is absolutely... The policy was not intended to insure... So I ask you, what was it intended to cover? It was intended to provide coverage for Clancy for work that it solely performed on the job site where it was negligent in the providing of professional services. Now a joint venture, you're missing my question. There was a joint venture rider put in. My question is, what did that rider provide coverage for? Well, that rider specifically says that it provides coverage for Clancy solely with respect to its work, Clancy's work, on the job site for a claim of professional negligence against Clancy. So if Clancy... What's the joint venture coverage at? What does it say about joint venture in that rider? It says Clancy's work pursuant to the joint venture. Well, there you go. Now the question is, this was his work pursuant to the joint venture. I just don't understand your argument of his individual liability. Sure, it only insured Clancy, but insured Clancy as a partner in that joint venture. No, it insured Clancy for the performance of its work. In the joint venture. For a contract or a responsibility that Clancy is given on the job site. You're darkening the joint venture language. What's it say? What specific language? Joint ventures, and that's the point, Your Honor, in this case. It's a partnership. Joint venture is subject to partnership. Correct. And every partner is jointly and separately liable with every other partner for the full liability of the joint venture. That's correct, but... All right, and so Clancy was liable as a joint venturer. Now why isn't he covered? Because a partner could have individual liability as well. It's not in respect to a joint venture. That's just not partnership law. Exactly, and that's the point of this case, Your Honor, is that the joint venture itself is not insured. No, the partner was insured, and he has liability for the entire joint venture as does every other partner. No, he only has liability under this limited endorsement for... to others. When the joint venture performs, he has 100% liability for the $14 million. No, the joint venture has the liability for the actual... Sir, it's partners. A partner has joint and several liability with every other partner. Correct, but... And Clancy had liability for the $14 million as part of that joint venture, and the rider insures his liability as part of the joint venture. It's individual liability as a partner in the joint venture. It is not individual professional negligence that Clancy is being sued for by a third party. That is the coverage that's provided by this policy. Partnerships and joint ventures can be sued as legal entities. The owner of this project... This liability was Clancy's liability as a partner. There's nothing in the record that indicates that Clancy's work is its sole obligation. I thought you said it was joint venture. It is. He's a member of a joint venture, and he can be sued and be obligated to pay 100%. Right, but the policy at issue in this case does not insure that combined liability... That's created by law. What he's insured for is his liability in performing on behalf of the joint venture. No, he's insured for his own liability. Not joint venture liability. It doesn't say that. What does it say? It says that he is insured with respect to his work, solely with respect to Clancy's work. Well, didn't Clancy have some responsibility to supervise the work in this case? There was a joint supervision effort, and neither partner... That means that Clancy had some responsibility. But neither partner could act without the other. So there was no sole independent supervision work in the record that Clancy was responsible for, where Clancy made an error. So you seem... Okay, so are you suggesting that in order for liability... I guess this goes back to Judge Niemeyer's question. So what was Clancy buying with respect to this rider? It sounds like nothing. No, very limited scope. I mean, during the course, this joint venture entity, in this case, Brasfield and Clancy, could have hired either of the members of the joint venture for a specific task on the job site that would be covered for that task. If Clancy individually was out at the job site and undertook a responsibility and performed it negligently... I don't understand what you mean by individually. The job that was being performed at that job site was a contract issued to the joint venture. It was for the joint venture, correct. And everything Clancy did with respect to that job was as a partner in the joint venture. That is correct. All right. Now, the liability here says your members, your partners, and their spouses are also insureds with respect to the conduct of your work. And your work is the work of the joint venture. And partners are jointly and severally liable. They can be sued for the full amount of joint venture liability. And that's what he got. It says endorsement or joint venture endorsement. General liability for joint venture. Right. A partnership or joint venture, you are insured. I mean, I don't know what he bought if he didn't buy his liability as a joint venturer. They bought liability for any claim that was made against an individual partner of that partner. We did not insure the combined liability of Brasfield and Clancy. We only took the liability if Clancy Except there is no such thing. You are creating something out of whole cloth. In first year law school, you learn that a partner is liable for the entire partnership obligation. Right. Number one. Number one. And number two, the clause says that the joint venturers are also insured. The liability, though, is against the partnership under partnership law. Under Ratton, Midland, under Jones, under the post case that we cite in our briefs. Your members, your partners, and their spouses are also insured. What's that mean? The joint venture is not insured. The joint venture is not named. So partner A and B of a joint venture are insured, but not the joint venture? Well, there's an exception at the very beginning of that endorsement, which it says any joint venture which is designated in the deck page, which it's not. So it excludes the joint venture in this case. This, that exclusion is overridden by this endorsement. No, the endorsement refers back to any designated joint venture in the deck page. Again, it's our position in this case that under partnership law, a partnership is sued. Only where they name the individual partner. If they can't find another partner, if it's insolvent. It means doing the opposite of what you just said. It says you are also, also insured with regard to your participation in a joint venture that is not designated in the declarations. So even though it's not designated in the declarations, you aren't insured. What I said was the joint venture, where the liability is created in this case, is not insured under the policy. Clancy is insured under this policy in a very limited capacity. What was he insured for? What was Clancy insured for? If Clancy or his All his work in furtherance of the joint venture. No, no, his own work. It says solely with respect to Clancy's work. Clancy's work for providing professional services on a job site. If Clancy didn't perform any of those services Well, what's the joint venture referenced to? Liability under the joint venture? Because the joint venture could hire Clancy, the company who is our named insurer, to enroll at the job site. And if Clancy erred in performance of that respected work, Clancy would be insured. It's a $1,000 premium for the endorsement. If they were insuring the entire joint venture, which they didn't do, because it was cost prohibitive, it would have cost them tens of thousands of dollars in premium to do that, and they chose not to do that. Which is simply double talk, because all you're saying is that Clancy's work with respect to the individual work with respect to the joint venture is covered. And I don't understand how you identify his individual work. He is always a partner of the joint venture. The contract for that project was issued to the joint venture. He wanted our joint ventures were excluded under the policy. He went there and said, give me an endorsement to cover my liability on this project. They give him joint venture liability. I just, I must say, it looks to me like there's a total overlooking of partnership liability. Partnership liability. You can insure a partnership. You can insure a joint venture. No, you insure the liability incurred by your performance as part, your membership in a partnership. The partnership under North Carolina law is subject to liability. The partnership can be sued. It's in every state. It's the same. We're talking about common law. Right. And here, the joint venture can be sued. We didn't insure that joint venture liability. The joint venture is not an insurer under this policy. The joint venture in this case was liable. I don't know if that makes a bit of difference whether they name the joint venture, but there I read that clause. You want to hear it again? I mean, it's, it's, I don't have to. It says your members, your partners, your partners, that's the members of the joint venture, and their spouses are also insured. But it says only with respect to your conduct in, in your business. So if you did, you did something wrong in your business, they're insured. The partnership's insured. And there's nothing in the record that indicates that Clancy, the company, did anything wrong at this job site. The liability stemmed from a joint venture subcontractor. Yeah, but they issued, aren't they responsible under general contract law for the whole project? No, the joint venture is liable. That's what I'm saying. If the joint venture assets are not sufficient to satisfy a judgment, then they could go after the individual members of the partnership. That's not the case here. Mr. Walker, you said that there's no way that your company would have undertaken this liability given the amount of the policy premium. I think you said it was $1,000. But wasn't it also clear that there was a division of both profits and liability under the joint venture agreement such that Clancy was, in the end, only ultimately liable for 30 percent of any liability? And doesn't that sort of impact what the, whether, you know, the amount of liability that your client was willing to undertake here? Right. And the Third Circuit, in a very similar case to this one, analyzed that issue. It's a contractual liability. It's not a negligent liability for a claim of a third party. I mean, in order to trigger coverage, you have to have a claim for damages by a third party against the insurer. In this case, Clancy. And that didn't happen here. So that's a separate issue. But I'm asking you with respect to your contention that your client never would have undertaken this liability. But doesn't that limitation make it more reasonable that this is exactly what was intended here? No. Because as Justice Demeier pointed out, it's a liability of the entire joint venture. It's a $54 million project. They didn't undertake the risk of the work done by the joint venture in that $54 million project because they didn't insure the joint venture. They insured a very small risk involved if Clancy was sued for professional negligence for work they performed. And that wasn't the case here. Why would they even mention the joint venture? Why wouldn't they just mention it? Because the joint venture could hire Clancy or any other subcontractor to do work on the project. They would just say that the professional liability of Dawson was protected wherever he performed. The problem was they were doing this project not individually. Dawson was not hired individually. He was part of a joint venture. Right. Because this policy was written to take out the joint venture exclusion because Clancy was undertaking participation in a joint venture and wanted to insure its share of liability for work it performed that it could be sued for for negligence. How does this endorsement, if in fact what you're saying is correct, how does this endorsement provide coverage that is any different from the general liability coverage that Clancy had under the policy? Because it's a professional negligence policy. They're not covered for professional negligence under the original policy? No, it would be excluded under a general liability policy. All right. So with regard to the damage aspect of this case, you know, we believe that under Hamel Law in North Carolina the joint venture is the liable party here. They were not insured under this policy. If the court accepts the doctrine that they're responsible for their 1% share in this case is only 30%. The total damages in the case for cost overrun were $14.4 million approximately in change. They recovered from all the subcontractors and their insurers $10.5 million leaving a shortfall of $3.9 million in the case. Clancy's 30% share would only be $1.18 million, yet they claimed and were awarded $1.774 million in this case. Even under the most broad interpretation of liability under this policy, for Clancy that portion of the judgment has to be overturned. It also includes claims for attorney's fees or costs that they incurred internally themselves, which are not damages from third party liability. So I see your time is up and you can bring this up on rebuttal. Thank you. All right, Mr. Gwynne. May it please the court, I'm Holt Gwynne from Greensboro, North Carolina and I represent Clancy. Picking up on what the panel has asked, we're not asking that the joint venture be insured under this policy and never have. It was Clancy's separate policy, just like Brasfield and Gorey had its separate professional liability policy. But the professional liability policy covered construction management services and project management services. And if you look at the findings from Judge Britt, especially number 42 I believe it is, he says that the damage to the building, and there was severe damage to a building when a seven story building sinks differentially five inches in one area. Then the damage to the building was such that it was caused by a combination of actions by Clancy's own individual employees, which is what Mr. Brooker seems to suggest that wasn't shown. But it was shown. So in addition to the damage by the subcontractor who made an error, there was also damage caused by the professional negligence of Clancy's individual employees. That's Don Street, that's Dave Bennett. They were responsible for the site work. They were responsible for the submittals that came in for this GOP or system which was supposed to stiffen the ground so that a spread footing assembly could work in a building like this. And it didn't because of an error, but it also didn't because of the errors of Clancy specifically and Brasfield and Gore. They all had that and they all admitted that. And we all participated in the cost of repairs which took $14 million. What's your response to his suggestion that it should have been 1.1, not 1.7? There's two separate, first of all the building was damaged. The project was, this was not a cost overrun. A cost overrun is a situation where you expect that there will be 500 feet of electric wire to be put in and it turns out there's 1,000. And you blew the budget. In this case, the building and the project, they were two separate projects. The first was the original project and for these two wings, the east wing was totally different because it was damaged and you don't jack up a 10 story building. So what you had to do was to take this building that settled like this and totally, first of all you have to underpin it to keep it from settling anymore because at the time it was discovered it continued to sink. And it continued to sink for several months until all those micropiles were in it. And then you had to readjust because there are two buildings. If you look at the photographs, there are two wings and this one is fine and this one is five inches lower. So you had to change and the contractors took the risk and took the responsibility that they would do that and they gave huge extended warranties for all of this work and things that the general contract, way beyond the general contract. And in addition, they had to pay the owner $698,000 in cash, which they paid 70-30. That's the testimony to the owner because the owner said, I'm going to watch you every second of what you're doing to make sure and I get to reject it right up to the end. So that's what happened. But the contractors were able to change things and were able to hire additional people and make windows that wouldn't be able to be like this. They had to figure a way to make them work so that you couldn't see and in the long distance you could take some of those things away. But that's the way, so it's a totally different project was the repair and recovery effort to the project. So they kept it with this is the repair and recovery effort and this was the main project. And so all of the, and the court found, and there's plenty of evidence to support it, that that was not a cost overrun, but that was to repair the damage caused by the professional negligence. What the court did is took what, the total damage, subtracted the amounts recovered from the subs and the other insurers, was left with a number and then the court entered a 30 percent of that number against? Of the cost of the repairs. He took the total cost of repairs, less the amount of the recovery from others, and plus Mr. Clancy's $1 million that he put up at the mediation, which Westchester chose not to attend, at the final mediation and after the project had been accepted and Capstone was out of the picture at that point, the final mediation, the Zurich, which was Brassfield and Gorey's professional liability insurer, said I'm not going to put anything up unless Clancy's professional liability insurer, Westchester, puts up a 30 percent of it. So Mr. Clancy agreed to write a check for $1 million, and so Zurich at that point put in $2.75. That's $30.70. So without Mr. Clancy's $1 million, there would be no settlement. And one of the things that the court found was that by putting up that $1 million, they were able to get to the rest of that money in the settlement, and that's what made the mediation work. Now, so Mr. Clancy and Faye's damages are the $1 million plus $700,000 of the amount that was not paid, that is 30 percent of the amount that was not paid on the recovery effort. And that $700,000, yes, it included some interest because these two contractors had to fund this $14 million. Well, it was $1.7 million and change. Right, right. And it included some money for my firm, that's true. And the reason it included money for my firm was because Westchester did not step up and defend. Remember, they had a duty to defend their insured for the professional negligence, okay? They didn't do that. So somebody had to do it. Somebody had to negotiate with Capstone. Somebody had to negotiate with the other subs. Somebody had to come up with a mediation process, and that's what I did. Anyway, the point is that their duty to defend would include all of those things. In a situation like that, the liability insurer makes claims against all the subs, and that's what we were doing. We stepped in the shoes of Westchester and Well, the ordinary thing would be to pay the full amount and then subrogate against the other. Or defend and bring in the other third parties that are That's what I say, subrogate and make claims against the others or the other insurers. Right. Now, a couple of other things that Let me ask you a question about this endorsement by, say, separate policy. There was something as I recall in the record or in the briefs that suggested that purchasing a policy for the joint venture separately was cost prohibitive either in this case or some other, and that this simply was an end around to avoid having to pay the full cost of a joint venture liability policy. Well, there are two things about that. First of all, there's nothing in the record about that particularly. I will admit that it's true that a joint venture endorsement is cheaper than a separate stand-alone policy. But let's not forget, Brasfield and Gorey had $15 million of professional liability insurance, and so the joint venture agreement specifically says that Brasfield and Gorey would take care of its professional liability insurance and Clancy would take care of its professional liability insurance. And so Clancy bought a joint venture endorsement to cover it for its liability. Now, Mr. Brasfield has misstated this several times. He says that the joint venture endorsement says that it covers the performance of Clancy's work. It doesn't say that. It says it covers Clancy's liability arising from the performance of Clancy's work in connection with a joint venture. Isn't that liability further qualified by the division of both profits and liability under the original joint venture? So it's 30 percent, right? Yes. They were only getting 30 percent. And we're not asking for the joint venture to be covered. We're only asking for Clancy to be covered. And we thought they'd be happy that we got it down to a million seven instead of 14 million. But the point there is, again, that it is Clancy's liability. And Clancy's liability arises two ways. First of all, as I mentioned, its own employees are out there. In other words, we complied with what Mr. Walker said. We did work out there that turned out to be professionally negligent, found by the court, plenty of evidence to support it, and under butted. And secondly, we were responsible because we are one of the two general contractors for the work of the subcontractors to Capstone. So we're liable to Capstone for the negligent performance of the professional liability for this design-build aspect of the work, meaning the foundation system. When did the building stop sinking? The building stopped sinking when we put in the micropiles. But that took us from November to February. And Capstone didn't sign the huge change order, which totally changed the everything about that particular wing, and where we undertook the risk to make sure all of those things would work. And so you couldn't see the problems in the floor, you know, build up the floor here, you know, all that sort of stuff that when you go from one doorway through a doorway and it's like this, there's some things that you can do, but it takes a while. All right. And we undertook that risk, and that was part of the repair and recovery effort. Now, I want to say just a couple of things about the tortious breach. And I'll come back to that in rebuttal, but we have a claim for tortious breach, and that arises from the deliberate failure by Westchester to issue a coverage determination. Now, Judge Boyle in his summary judgment got it wrong there. He said that there was a coverage determination in May of 2012 by Westchester, which said there was no coverage. And he said that while that may have been wrong, he didn't think it was tortiously or deliberate. Well, the problem is it was not. They sent us a letter and word by e-mail, unsigned, which they told us, Mr. Dan Frazier, who was the adjuster, told us that it was just, it was not formally issued. And he wanted us to sort of comment on it. So we did. And then they totally retracted it in August of 2012. And then the lawsuit was filed by them. What's the evidence of that they're in bad faith? I mean, it sounds to me like they were evaluating this policy. The language is not the king's English. And the arguments are what was being covered. The law is, and the testimony from Mr. Frazier and from the 30B6 representative of Westchester is a deliberate failure to issue a coverage determination is bad faith. And so they let you issue a coverage determination for a year. I mean, you got 8% interest for the use of money, loss of use of money, didn't you? We got 8% interest from the time. That's correct, pre-judgment interest. That's a good return for your damage. That's really your damage on this thing is the loss of use of your money. Well, there's more than that here. You got your attorney's fees. But not for this case. Not for leading us this merry chase that we've had on this case. It's a deliberate failure to defend. And they knew, in other words Well, how do you find deliberate? I thought the whole crux of this was their view that until an actual claim was filed by a capstone, that they couldn't really decide whether or not there was coverage. Well, they said that until an actual lawsuit. But the policy doesn't say that there has to be a lawsuit. Well, I thought they said an actual claim. I'm not sure that you applied a lawsuit. Well, the court found that there was a claim made on October the 1st of 2011. And they are still dithering around in May. But they did say in May, we've done all of our investigation, there's no more to do. But then they didn't issue a coverage determination. And then in May, they issued a coverage determination. We're, quote, continuing to investigate. But they didn't know. The evidence is clear. They did nothing between May and August to do any additional investigation. As a matter of fact, Mr. Frazier, the adjuster, testified that he was going to do nothing and continued to say that he would just, quote, investigate, unquote, until there was a lawsuit filed by capstone. But, of course, once capstone accepted the building in August, there was never going to be a lawsuit because they accepted the building. They accepted it with all of the modifications that we've done. And so capstone was dithering around. They weren't dithering. They were planning to do nothing, hoping that capstone would accept the building because then they knew that there would be no lawsuit by capstone. They knew that it would improve their position in litigation. And they knew that hopefully we'd be able to collect all the money from the subcontractors and reduce their amount that they might be liable. And that, to me, is a tortious breach because of its character and the way they went about it. And this Court shouldn't condone it. It should allow us to put that in front of a jury. Thank you, Mr. Blaine. Mr. Worker. Thank you. Running through a few points. Justice Diaz asked about where in the record it was with regard to the cost prohibitive nature of the joint venture policy. It's in the joint appendix at 1657 through 1662. With regard to the 30 percent liability issue and the contractual claim that the joint venture has between themselves pursuant to the joint venture agreement, it's not a negligence claim. This is a claim of faulty workmanship that's performed by the joint venture. If this Court, like Judge Gray, holds that cliency is one and the same as the joint venture, then that faulty workmanship is not covered under the policy. This is not a performance bond. They purchased insurance for performance of their contract. And this is clearly just a breach of contract in that they didn't perform their work correctly through one of their subcontractors that resulted in this claim. We argued that in front of Judge Britt, we argued that it wasn't covered, that the claim itself was excluded under terms of the policy for warranties or guarantees that are put in a contract. And this is exactly the case that the Third Circuit looked at in that Permit Stealing case and said, you know, insurance policies are not performance bonds. They don't guarantee the work of the contractor. And for that reason, if this Court affirms Judge Britt's ruling that clancy and the joint venture are one and the same for insurance purposes, you know, there still is no coverage under this policy. With regard to the tortious breach claim, there is no tortious breach in this case. They had a deal worked out before they even submitted a claim to Westchester on behalf of Clancy. We outlined in our brief, especially in the reply brief, specifically the back and forth correspondence that was going on between Westchester and Neal Adams, the Vice President of Clancy. During the course, and I want to draw the Court's attention specifically to an email, May 7th, that Neal Adams wrote to Dan Frazier at Westchester. He provided additional cost information to Dan Frazier at that time. And then within a few weeks, you know, at the end of May, Dan Frazier issued the denial letter that's at issue in this case. Clancy came back with a response in June and Westchester responded again to that letter. They were at an impasse and Westchester was being threatened with a bad faith litigation suit by counsel. And at that point, Westchester felt that it was an impasse and filed a declaratory judgment action. The KISS law is clear that the filing of a declaratory judgment action to resolve a coverage dispute, and there was a lot of dispute in this case. When was the action filed? It was in September. So, you know, there's a lot of dispute in this case. You know, Clancy argues that there was a claim made against them immediately. You know, if you look at the emails from Neal Adams that are part of the record in our offer of proof, you can see that they were internally recognized that there had to be a claim made against Clancy and there was not. And they started manufacturing this claim. They started claiming that there were a $20 million claim by the owner against Clancy. That was not true. They claimed to Westchester in correspondence that they had expended $4 million in this case. That was not true. There were a number of misstatements that Westchester kept on looking into during the course of this time that they're claiming that there was a delay. There was not transparency. There was not honesty in the presentation of the claim and that's what was being investigated. So the delay in this case was not attributable to Westchester. It was attributable to the misinformation and this fallacy or fiction of creating a claim against Clancy, which never happened. With regard to the math, I mean, math is math and I went through this in cross-examination with Mr. Clancy. It's their numbers. They say that the shortfall was $14.4 million of cost overruns. It's not cost overruns. It's a repair. A cost overrun is a totally different concept in the law and it doesn't help to use that term. Well, that's how they characterize it. They put a separate ledger sheet to run those costs. When you repair a deficiency, that's not a cost overrun. In the terms of their contract, they were referring to it as a cost overrun. I agree with the court. I was using their terminology as to how they characterize a separate spread sheet where they track those costs. And those costs, they attributed to the repair of this foundation at $14.4 million and change. After they collected back from all the subcontractors that were involved, their performance bonds from the insurance companies and all the sources, they got $10.5 million back. If you subtract the two, it leaves $3.9 million. The fact that Clancy volunteered to put a million dollars into the joint venture account really is irrelevant to the issue of what their percentage liability of damages are for. Contractually, they're only obligated to pay 30%. 30% of $3.9 million is now $1.774 million. And Clancy never explained to the district court why they overpaid their percentage share. And we should not bear that burden of that expense in this case. Thank you. Thank you. We'll adjourn court for the day. Oh, no, Mr. Allen, you have, Mr. Wynn, you have some rebuttal. I'm sorry. This is on the cross-claim. Yes. For Westchester to say this is not a negligence claim, there's an implied duty of a standard of care. It's clear that you have to conform to the standard of care of a workmanlike construction. And for a design bill aspect, you have that. And so that's separate from any contract. You should really be addressing the cross-appeal. All right. The timeline is important here. Damage was September 2011. The claim was October 2011. It was a demand for services. Either tear down the building, which we estimated to be $20 million, or if you want to take the risk that you can fix it, okay, but we'll have the, we, Capstone, will have the ability to say no to that all the way up to the end. And that was estimated to be $12 million, but it turned out to be $14 million. Mr. Frazier doesn't get appointed by Westchester on this until January. Their first adjuster, Mary Barrett, issued a letter saying, we got your claim. And then she quit the company, and they took a while to get it finally to where they got it to Mr. Frazier. He receives information all the way through the spring of 2012. In May of 2012, he issues this letter, which is not a coverage determination, unsigned, in word, telling us at the same time, we'd like for you to respond to this, testifying in his deposition that it was not a coverage determination. It was not formally issued, and then retracting it specifically, the terms of his August letter. Now, the August letter comes after the project's already been accepted by Capstone. And that's at that point they say they're still investigating. Now, the project's over at that point. The only thing left is the dollars. And so we say, come on, this doesn't make any sense. You know, we're going to treat it like it's a denial. And they say, okay, well, we'll file suit against you for declaratory judgment. So they race to the courthouse. And what followed was all this litigation that has culminated in this appeal. So all that's by way of saying that that kind of conduct by an insurance company shouldn't be conducted. Thank you, Your Honors. All right. We will now adjourn court for the day and then come down and greet counsel. Thank you.
judges: Paul V. Niemeyer, William B. Traxler, Jr., Albert Diaz